Filed 7/6/15  P. v. Albarran CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067418 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF060734) |
| MARCOS ALBARRAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Victoria E. Cameron, Judge.  Reversed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Marcos Albarran of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1); three counts of premeditated attempted murder (§§ 187/664; counts 2-4); and the discharge of a firearm at an occupied vehicle (§ 246; count 5). As to all counts, the jury also found that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and a co-principal, acting to benefit a criminal street gang, discharged a firearm and caused great bodily injury or death (§ 12022.53, subds. (c), (d), & (e)).

The superior court sentenced Albarran to prison for 50 years to life, comprised of 25 years to life each for the offense and firearm enhancement as to count 1. The court further sentenced Albarran to prison for three concurrent terms of life with the possibility of parole plus 25 years to life for the offenses and enhancements as to counts 2 through 4, and also imposed and stayed the sentence for count 5.

Albarran appeals, contending under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), (1) he could not be convicted of first degree murder under a natural and probable cause theory; (2) the trial court committed prejudicial error by providing the jury with an outdated version of CALCRIM No. 400; (3) the trial court improperly admitted other crimes evidence; (4) the prosecutor committed prejudicial misconduct; and (5) cumulative error warrants reversal. We agree that *Chiu* is controlling and Albarran could not have been convicted of first degree murder under the natural and probable consequences doctrine. Also, we agree with Albarran that cumulative error rendered his

---

[1]	Statutory references are to the Penal Code unless otherwise specified.

2

trial fundamentally unfair. We therefore reverse the judgment and remand this matter for a new trial.

FACTUAL BACKGROUND

Prosecution

On September 3, 2007, Manuel Duarte and Ulises Morales had a family get-together at their house in Thermal, California. Ulises's cousins, Edgar Cruz and Geovani Morales, attended the event. Late that afternoon, Geovani drove Duarte, Ulises, and Cruz to the market in his Honda to purchase beer. After buying beer, the young men went "cruising" for women. They played the music in the Honda loudly as they drove past La Chicanita Market and toward Lawson's Mobile Home Park on 70th Avenue. As they drove past La Chicanita, Ulises saw two men, later identified as Albarran and Pedro Mendiola, making gang hand signs and the "what's up" gesture, and shouting "Varrio Oasis" at them. No one in Geovani's car said anything or threw anything at the two men, and Geovani continued driving into the trailer park.

Once inside the trailer park, Geovani and his companions encountered Albarran driving a Mustang, with Mendiola in the car. Based on his tattoos and white sleeveless t-shirt, Ulises recognized one of the men in the Mustang as one of the people who made gang hand signs at La Chicanita Market. Albarran stopped the car and either he or Mendiola shouted "what neighborhood [are you] from?" Geovani answered that they did not have a neighborhood and asked what they wanted. Albarran responded that they should leave and, either got out of his car with an aluminum baseball bat or stuck the bat

3

out of his car window, and hit Geovani's car. Geovani was afraid and got out of his car with a tool similar to a tire iron, and asked Albarran and Mendiola what they wanted and why they hit his car. Ulises also got out of the car. Duarte threw a beer at the Mustang after Albarran brought out the bat. Either Albarran or Mendiola shouted "Varrio Oasis" and then Albarran drove out of the trailer park. At the same time, Albarran was talking on a cell phone. As Albarran drove away, Geovani threw the tool he was holding but did not hit the Mustang.

Both cars exited the trailer park onto 70th Avenue. Albarran stopped between the west edge of the trailer park and the main road leading into the trailer park. Geovani stopped behind the Mustang to see what Albarran and Mendiola wanted, and why they hit his car. The two men got out of the Mustang, and Geovani and his friends also got out of the Honda. Ulises, Duarte, and Cruz had nothing in their hands at this point. Very quickly thereafter, an SUV drove up and parked behind Geovani's car. Three or four people from the SUV, including its driver, walked toward Geovani's car. The man who had been driving the SUV had a gun in his hand, and was shooting toward the Honda as he was walking toward it. Ulises threw himself to the ground for cover and Geovani and Cruz dove into the Honda. Two rounds struck Duarte, who fell into the car after being shot. He was bleeding from his forehead and was slumped down in the seat.

Ulises ran into the trailer park and Geovani drove away toward the hospital with Duarte and Cruz in the car. While Geovani drove, Cruz called police. At some point,

4

Geovani had to stop the car because he had a flat tire. Police and an ambulance responded to the location where the Honda stopped.

Duarte received two through and through gunshot wounds, one to his head and one to his forearm. He died a few days after the shooting from the gunshot wound to his head. Cruz also suffered an injury to his elbow, resulting in a permanent scar.

Mendiola testified during the prosecution's case-in-chief as part of a plea deal. Mendiola lived in Lawson's Trailer Park at the time of the incident. He testified that on the day of the incident, he was waiting for the bus in the parking lot of La Chicanita Market when Albarran saw him and drove over to say hello. As they were talking, he saw some guys in a Honda drive by on 70th Avenue while yelling at him and Albarran, but he could not hear what they were yelling. Mendiola thought they were being disrespectful to him and his gang. Albarran told Mendiola that the men were from a rival gang, Varrio Thermal.

At some point during the incident, Albarran made an "0" for "Varrio Oasis" with his hands. He made the sign up in the air where it was visible to the men in the Honda.

After the Honda drove into the trailer park, Albarran told Mendiola they were going to go "check [to see] if the kids were going to leave" and Mendiola got into Albarran's Mustang. Albarran and Mendiola drove toward Mendiola's trailer, but he did not have his keys so they started to drive out of the trailer park. At that point, they encountered the Honda. After the men in the Honda asked if they had a problem,

5

Albarran shouted "Varrio Oasis." The men then got out of the Honda. Albarran hit their car with a baseball bat and drove away.

While Albarran was driving out of the trailer park, he told Mendiola he was going to call Moncho (Ramon Ames), who was near. While on the phone with Ames, Albarran said "Moncho, can you come over, because we have some problems, to help us fight because they are more than we are." Albarran also told Ames that the men were the people Ames had problems with previously. Albarran stopped the Mustang on 70th Avenue to watch the Honda. When the men in the Honda stopped and got out, Mendiola and Albarran got out of their car to fight them. At that moment, Ames pulled up and stopped very quickly. Mendiola looked at the men in the Honda and then heard shots fired. He turned around and saw Ames shooting at the men from the Honda. He also saw another man in the passenger side of Ames's SUV. One of the men from the Honda ran toward the hills and the other men got into the Honda. One of the men from the Honda pleaded with Ames to stop shooting. However, Ames walked toward the Honda and continued shooting as the men tried to get inside it and drive away. Ames's brother was a member of Varrio Oasis Riffa (VOR) on the date of the incident.

After the shooting, Albarran took Mendiola to his girlfriend's house. Mendiola was brought into the sheriff's station a day or two later, and was allowed to leave after speaking with detectives. Shortly thereafter, Ames and Albarran spoke with Mendiola on the phone. Albarran wanted to know what the investigators asked Mendiola and how the

6

police knew they were all involved. Albarran also told Mendiola not to tell the police anything about the shooting.

An investigation of the crime scene on 70th Avenue revealed that 15 bullets had been fired from two different guns. Two beer cans also were found at the crime scene.

A search warrant was executed at Ames's trailer. Officers found two barrels outside his trailer with the name "Moncho" written on them. Officers also found paperwork with Ames's name and a round metal tin with "VOR 76 Street" written on it in a dresser drawer in one of the bedrooms. While officers secured the trailer, Ames's sister approached them. She allowed an officer to look at her cell phone, which listed a number under the name "Moncho." A search warrant for the cell phone records for the date and time of the shooting revealed a telephone number officers believed belonged to Albarran.

Albarran was arrested at his girlfriend's house in January 2008. As officers placed Albarran under arrest, he said "I knew this was going to come back to haunt me." Officers dialed the number they believed belonged to Albarran and the cell phone in his pocket rang. When officers examined the cell phone, it had only a contact and number for Moncho and for Ana.

Ana Mora was Albarran's girlfriend prior to, and at the time of, the shooting. Albarran lived with her a few months before the shooting and she gave him a phone. At some point, he moved out and took the phone with him. He did not live with her in September 2007. Mora spoke with Albarran by phone shortly after Labor Day, in 2007. He called her at night and asked if she wanted to go with him to Mexicali. Mora declined

his offer.  She saw Albarran again right before Thanksgiving in 2007, and he lived with her until he was arrested in January 2008.

Albarran was interviewed by police after he was arrested.  He told officers that on the day of the shooting he drove his Mustang to La Chicanita Market and bought beer. When he walked out of the market, he saw Mendiola and then saw a Honda drive by with four men inside yelling and throwing "Thermal" gang signs at them.  Albarran told Mendiola and another person to get in his car because he thought they were going to get beat up by the men in the Honda.

Albarran drove to Mendiola's trailer, and the men in the Honda started to follow him while screaming and throwing things at his car.  At some point in the trailer park, the cars got very close to each other and stopped.  Albarran was angry so he tried to grab his bat, but he could not find it.  The men in the Honda were still throwing things at his car, and when they stopped all four men got out.  Albarran also got out but Mendiola stayed in the car.  Albarran realized he was outnumbered, so he got back in his car and drove off.

Albarran called Ames for back up and said "I need a favor.  These fools are jumping me over here.  Can you help?  Come and help me?"  Ames showed up immediately.  As soon as Ames's SUV pulled up, the men in the Honda started to back up and Albarran threw a beer at them.  Ames got out of his SUV and started shooting. Albarran denied telling Ames to bring or use a gun and that he only expected to engage in a fair fight.

8

Albarran admitted that he and Ames fled to Mexico after the shooting and that he stayed there for about two months.

A gang expert testified that VOR was an active criminal street gang on September 3, 2007. VOR claims as its territory the area that includes Lawson's Mobile Home Park. VOR's primary activities include auto theft, burglary, possession of concealed weapons, possession of loaded firearms, and assault with a deadly weapon. At the time of the altercation, Albarran was a member of VOR.

The expert opined that a gang member would confront or challenge anyone in his territory he perceived as being disrespectful to his gang. Disrespect could be shown by someone drawing attention to himself in front of the gang. If they are outnumbered in a confrontation, gang members will typically call for backup to come and bring weapons. A gang member will normally call someone that he can trust and who likely carries a weapon for back up. Shouting "Varrio Oasis" is an indicator that the people in question are engaged in gang motivated activity.

An associate of a gang can earn membership in the gang by "putting in work," which consists of committing crimes for the benefit of, or at the direction of, the gang. An associate can put in work for the gang by responding to a gang member's request for backup during a confrontation, and carrying weapons and being willing to use them. An associate can also be "crimed" into a gang by committing murder. The expert opined that Ramon Ames was an associate of the gang at the time of the shooting. He further opined that if an associate responds to a request for backup by going to the scene with a gun and

9

shooting and killing someone opposing the gang, his respect level would be considerably elevated within the gang and it is very likely that he would be accepted into the gang based on his commission of that crime alone.

Based on a hypothetical mirroring the facts of this case, the expert opined that the crimes were committed for the benefit of the VOR street gang.

Defense

Testifying on behalf of the defense, another gang expert opined that Ames was not a member of the VOR at the time of the incident. He testified that it is uncommon for a nongang member to be asked to commit a homicide to be admitted into the gang. He testified that if a gang member "hit somebody up" in his turf, he would be ready for the consequences and would not likely run away from the confrontation. He opined that it is unlikely a gang member would call a nongang member to help him out if he is protecting his gang's turf. He further testified that gang members are expected to assist each other during fights, frequently bring weapons, including guns, to back up other gang members during a gang fight, and frequently use guns to back each other up.

Based on a hypothetical with facts similar to those given by Mendiola and by Albarran during his police interview, the expert opined that the shooting was not gang related.

10

DISCUSSION

I

*THE NATURAL AND PROBABLE CONSEQUENCES DOCTRINE*

In a supplemental brief, Albarran maintains that, under *Chiu*, *supra*, 59 Cal.4th 155, his first degree murder conviction must be reduced to second degree. In *Chiu* our Supreme Court held, as a matter of law, that an aider and abettor cannot be held culpable for first degree murder based on the natural and probable consequences doctrine. Here, the prosecution proceeded on two theories of guilt. First, the prosecutor argued that Albarran was guilty of murder because he directly aided and abetted Ames in the shooting. Second, the prosecutor asserted that Albarran was guilty of murder on the natural and probable consequences doctrine by aiding and abetting the target offenses of assault, battery, or assault with a deadly weapon.

" ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' [Citations.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' " (*Chiu*, *supra*, 59 Cal.4th at p. 161.)

"In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or

11

encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder." (*Chiu*, *supra*, 59 Cal.4th at p. 165.) "[T]his same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder" because the required mental state of willfulness, premeditation, and deliberation is uniquely subjective and personal. (*Id.* at p. 166.) "Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Ibid.*)

"Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu*, *supra*, 59 Cal.4th at pp. 166-167.)

12

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory . . . ." (*Chiu*, *supra*, 59 Cal.4th at p. 167.)

The People contend *Chiu* is distinguishable because the jury instructions given in the instant matter were different from those given in *Chiu*. Specifically, the People emphasize that the court here instructed the jury that "[t]o prove that the defendant is guilty of this crime, the People must prove that: (1) The defendant committed an act that caused the death of another person; (2) When the defendant acted, he had a state of mind called malice aforethought; and (3) He killed without lawful justification." (CALCRIM No. 520.) The court further instructed the jury: "If you decide that the defendant has committed murder, you must decide whether it is murder of the first or second degree. [¶] The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." (See CALCRIM No. 521.) In contrast, the People note that the instructions in *Chiu* referred to the "perpetrator," (see *Chiu*, *supra*, 59 Cal.4th at pp. 160-161) which could mean either the defendant or his accomplice. Here, the instructions specifically referred to the defendant.

Although we acknowledge the difference in instructions between the instant matter and *Chiu*, on the record before us, this variation is not sufficient to distinguish *Chiu*,

13

*supra*, 59 Cal.4th 155.  Here, there was evidence at trial that Albarran called Ames because he was outnumbered, did not ask Ames to bring or use a gun, and believed that Ames would help him engage in a fair fight.  Based on this evidence, we are not persuaded that the jury did not find Albarran guilty under the natural and probable consequences doctrine.  Because we cannot conclude the jury did not convict defendant using the natural and probable consequences theory, we must reverse Albarran's first degree murder conviction.

## II

### *CALCRIM NO. 400*

Albarran maintains the trial court erred when it gave a version of CALCRIM No. 400 that included language that an aider and abettor is "equally guilty" of the crime committed by the perpetrator.  We agree.

### A.  Background

The court instructed the jury with the following version of CALCRIM No. 400:

> "A person may be guilty of a crime in two ways:  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  A person is equally guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.
>
> "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

The court also provided the jury with CALCRIM No. 401 as follows:

14

"To prove that the defendant is guilty of a crime based on the theory of aiding and abetting that crime, the People must prove that the perpetrator committed the crime, the defendant knew that the perpetrator intended to commit the crime before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime, and the defendant's words or conduct did aid and abet the perpetrator's commission of the crime."

During deliberations, the jury submitted the following question to the court: "Under the law, are the aider and abettor's actions/intentions and the shooter's actions/intentions considered the same?"

The parties and the court conferred regarding the jury's question. Albarran's counsel's maintained that the court should simply refer the jury "back to all the instructions." Counsel was concerned that reading the aiding and abetting instructions would not give the jury a "full and complete" answer because it was unclear whether the jury was referring to intent regarding aiding and abetting, the specific crimes, lesser included offenses, or self-defense.

The prosecutor and the court initially thought that the best course of action was to reread all three aiding and abetting instructions since the jury specifically asked about aiding and abetting under the law. However, after listening to argument, the court decided that, in addition to rereading the aiding and abetting instructions, it would include comments that every crime and defense lists the intent required and the jury should refer back to each individual crime or defense.

After rereading CALCRIM Nos. 400, 401 and 403 [natural and probable consequences doctrine] to the jury, the court made the following comments:

15

"I do not mean to draw any special attention to these three instructions. I read these instructions because your question specifically referred to the aiding and abetting issue. That is the law on aiding and abetting. [¶] As far as the required intent elements of the other crimes and/or of the defenses, there are instructions in the packet that deal with each one of the potential crimes and potential defenses. And those instructions will have the required intent element listed in those. [¶] Remember, you are the judge of the facts based on the evidence that was presented to you in this courtroom by applying the law to that evidence as I have given you the law."

## B. Law and Analysis

As a threshold matter, the People argue that Albarran forfeited his objection to CALCRIM No. 400 by failing to object to it or request further clarification at trial. Albarran concedes that his trial counsel failed to object to the "equally guilty" language in CALCRIM No. 400 at trial. We agree with Albarran that the issue is properly before us under section 1259, which provides that "[t]he appellate court may . . . review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." The cases equate "substantial rights" with reversible error—whether the error resulted in a miscarriage of justice. (*People v. Christopher* (2006) 137 Cal.App.4th 418, 426-427; see Cal. Const., art. VI, § 13.) As we explain, the "equally guilty" language of CALCRIM No. 400 affected Albarran's substantial rights by preventing the jury from giving the necessary consideration to Albarran's mental state in determining the extent of his liability as an aider and abettor. We therefore find it unnecessary to consider whether trial counsel's

16

failure to object denied Albarran effective assistance of counsel.  (See *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

Generally, an aider and abettor and a direct perpetrator are "equally guilty" of the same crime.  (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118.)  But like all general rules, this general rule does not always apply.  In certain circumstances, an aider may be guilty of a greater or lesser crime than the perpetrator.  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1122 [aider and abettor may be guilty of first degree murder even if perpetrator is guilty of manslaughter based on unreasonable self-defense]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577-1578 [aider and abettor may be guilty of lesser crime than perpetrator when crime ultimately committed was not a reasonably foreseeable consequence of act aided and abetted].)  Further, courts have criticized the former version of CALCRIM No. 400[2] as misleading while holding it was nonetheless generally an accurate statement of the law.  (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 (*Samaniego*) [finding the "equally guilty" language in CALCRIM No. 400 misleading in "exceptional circumstances" of the case]*; People v. Nero* (2010) 181 Cal.App.4th 504, 518 (*Nero*) [finding the "equally guilty" language in CALJIC No. 3.00 misleading "even in unexceptional circumstances"].)

In *Samaniego*, three defendants were each convicted of two counts of first degree murder, but no evidence showed who was the actual perpetrator for either murder.

---

2       In 2010, CALCRIM No. 400 was amended to remove the word "equally" before the word "guilty" from the fifth sentence of the instruction.  (See *People v. Canizalez* (2011) 197 Cal.App.4th 832, 847, fn. 14.)

(*Samaniego*, *supra*, 172 Cal.App.4th at p. 1162.) On appeal, the defendants contended CALCRIM No. 400 erroneously instructed the jury that an aider and abettor was equally guilty as a direct perpetrator. (*Samaniego*, *supra*, at p. 1163.) As a result, CALCRIM No. 400 relieved the prosecution of its burden to prove the mental state of an aider and abettor. (*Samaniego*, *supra*, at p. 1165.) The jury was free to define "aider and abettor" as it saw fit, and once it found that the perpetrator(s) had the mens rea needed, it could convict all of the defendants without necessarily finding that each had the requisite mental state. (*Id*. at p. 1164.) The prosecutor's theory for one of the murders was that the defendants had intended to kill a man named Green, but when they could not find him, they killed the victim. (*Id*. at p. 1162.) Thus, the jury could have found that one or all of the defendants had a different mens rea from the perpetrator (whoever it may have been). The court nevertheless found harmless error, because the jury also had found the defendants guilty of multiple murder special circumstances, which required an independent assessment of each defendant's intent, so the jury necessarily found the defendants each had the appropriate mentes reae for both murders. (*Id.* at pp. 1164-1165.) As noted, the court held that CALCRIM No. 400 was a correct statement of law, but misleading in the case's "exceptional circumstances." (*Samaniego*, *supra*, at p. 1165.)

In *Nero*, Nero and his sister Brown were both convicted of second degree murder, Nero as the perpetrator and Brown as an aider and abettor. (*Nero*, *supra*, 181 Cal.App.4th at pp. 507-508.) The jury instructions included the "equally guilty" language then found in CALCRIM No. 400. (*Nero*, *supra*, at p. 510.) The case was reversed

18

because of jury misinstruction, but not because the jury instructions contained the phrase "equally guilty." Though the jury instructions properly suggested that Brown's mens rea was not tied to Nero's, the jury asked if it could convict Brown of a lesser offense than Nero. (*Id*. at p. 518.) Instead of giving the proper answer, which is "yes," the trial court merely reread the instructions to the jury, repeating the "equally guilty" language in CALCRIM No. 400. (*Nero*, *supra*, at p. 518.) The jury next asked if an aider and abettor could " 'bear less responsibility,' " or be convicted of manslaughter if the perpetrator was guilty of second degree murder, and the court merely said the aider and abettor could be found not guilty, though the evidence could have supported manslaughter. (*Id*. at p. 519.) The jury was obviously considering imposing a lesser offense on Brown, and there was "a reasonable possibility that the trial court's response to their questions improperly foreclosed [that possibility]." (*Id*. at p. 520.) The trial court also instructed the jury that the aider and abettor " 'can bear no greater responsibility as far as degree,' " which is expressly contrary to *McCoy, supra,* 25 Cal.4th 1111. (*Nero*, *supra*, at p. 520.) It was the trial court's erroneous responses to the jury's questions that caused the judgment to be reversed, not the jury instructions themselves. (*Ibid*.)

The court in *Nero* stated that even in unexceptional circumstances CALCRIM No. 400 could be misleading, and the jury's questions in that case about how it could convict an aider and abettor suggested the instructions were "confusing and should be modified." (*Nero*, *supra*, 181 Cal.App.4th at p. 518.) As noted, CALCRIM No. 400 has since been modified to remove the word "equally" from "equally guilty." A potentially misleading

19

instruction, however, does not necessarily pose a substantial risk of actually misleading the jury. (*People v. Hughes* (2002) 27 Cal.4th 287, 341.) What is important is the understanding the jury receives from the jury instructions as a whole. (*Id*. at p. 356.)

Albarran contends the instant matter is similar to *Nero, supra,* 181 Cal.App.4th 504. We agree. Like Brown in *Nero*, Albarran was charged with murder solely on the theory of aiding and abetting liability. There is evidence presented at trial that Albarran called Ames because he was outnumbered and wanted a "fair fight." Further, evidence was introduced that Albarran did not tell Ames to bring a gun and did not know that Ames would bring a gun. The People diminish this evidence by focusing on Albarran as the instigator of the altercation as well as his gang membership. However, this evidence does not establish that Albarran knew Ames would bring a gun or that Ames would shoot at the men in the Honda upon arrival at the scene.

In addition, the jury's question here showed that it was considering the difference, if any, of the mens rea of Albarran and Ames (the actual shooter). In response to that question, the court reread the jury instructions, including the "equally guilty" language of the former CALCRIM No. 400. Under these circumstances, where the issue of Albarran's mens rea is highly contested as an aider and abettor, we conclude that the former CALCRIM No. 400 was confusing to the jury. We find no merit in the People's attempt to distinguish *Nero*, *supra*, 181 Cal.App.4th 504 from the instant matter on the basis that, unlike in *Nero* where multiple defendants were tried together, here, Ames and Albarran were not tried together. Although we acknowledge this difference, it is

20

insignificant in the context of the record before us. Regardless of whether Ames and Albarran were tried together, Albarran's mens rea was a highly contested issue in Albarran's trial. The fact that Albarran was not tried with Ames does not diminish this fact nor does it limit the confusion caused by the "equally guilty" language on the record before us.

Next, we must turn to the question of whether the error in instructing with the "equally guilty" language of the former version of CALCRIM No. 400 was prejudicial. We do so in the cumulative error section *post*.

### III

### *THE ADMISSION OF OTHER CRIMES EVIDENCE*

Albarran maintains the trial court abused its discretion by admitting certain evidence regarding Albarran's other crimes. Specifically, he argues that the admission of evidence of his prior concealed weapons offenses was more prejudicial than probative resulting in a denial of due process and a fair trial. (See *People v. Leon* (2008) 161 Cal.App.4th 149, 168-169.) We agree that the court erred in admitting the evidence and discuss the impact of this error in the cumulative error section below.

### A. Background

The prosecutor filed a motion in limine to introduce 11 prior crimes, including seven committed by Albarran, for purposes of establishing the crime pattern and primary activity elements of the section 186.22, subdivision (b) enhancement charges. Albarran's counsel opposed the prosecutor's motion, pointing out the prejudicial impact of the

21

admission of a defendant's prior crimes. The prosecutor responded that, among others, the prior crimes evidence was necessary to demonstrate Albarran's knowledge of the primary activities of the VOR gang as well as the foreseeability that a confrontation that began with gang challenges and the use of a bat would escalate into murder by firearm.

During oral argument on the motion, the court noted that although there may be legitimate theories under which the predicate acts might be admissible, it also needed to consider the prejudicial effect under Evidence Code section 352 and the cumulative nature of the multiple crimes evidence. The court ruled that Albarran's prior juvenile adjudications, as well as one predicate crime involving an assault on a minor committed by Albarran, would be excluded, but that five of the remaining six crimes listed by the prosecutor in its motion would be allowed.

The court observed it would allow the prosecutor to introduce the crime listed as number six in the prosecutor's motion, which consisted of Albarran's and a fellow gang member's possession of two concealed firearms, one of which was loaded, found in Albarran's car by law enforcement. The prosecutor described that crime as a primary activity of the VOR gang, and its commission was proof of Albarran's knowledge of that particular activity. In ruling the crime could be presented to the jury, the court explained that it was also relevant as to identity, motive, knowledge and intent, and that the court would "do a limiting instruction" as to all of the admitted predicate crimes.

During trial, over the objection of Albarran's counsel, the prosecutor elicited testimony that on July 15, 2005, Albarran was arrested for possessing one loaded and one

22

unloaded firearm in his car during a traffic stop.  The possession of the firearms was a violation of former sections 12025 and 12031.  On that date, both Albarran and a passenger in his car admitted to being members of the VOR gang and provided their monikers to the patrol officer who conducted the stop.  The evidence was offered during the prosecutor's direct examination of Ortega, the gang expert, as to the predicate crimes committed by the VOR gang.  In addition to the evidence of Albarran's concealed firearm offenses, the prosecutor offered evidence of four other crimes committed by VOR gang members.

The predicate crime evidence was further offered to the jury during the presentation of Albarran's taped interview with detectives.  Out of the jury's presence, the court and counsel conferred about the transcript of Albarran's interview with the detectives.  Specifically, they discussed the following portion of the interview:

> "[Detective]:  Does Pedro [the passenger in Albarran's car] normally carry a gun?
>
> "ALBARRAN:  Naw, he don't carry no guns.
>
> "[Detective]:  Is there sometimes a gun in your car?
>
> "ALBARRAN:  Never.
>
> "[Detective]:  So you're saying if he had a gun, he would have pulled it out?
>
> "ALBARRAN:  I been cut up with guns before.  I've been cut up like my - - like my - - like my second violation, I think my first violation on parole when I was in CYA [California Youth Authority]."

23

Albarran's counsel objected to the inclusion of any reference to being "cut up with guns before." The prosecutor agreed that the statement "I've been cut up like my -- like my - - like my second violation, I think my first violation on parole when I was in CYA" should be redacted. However, he argued the first reference to being "cut up with guns before" should remain because that statement showed Albarran admitted to the weapons possession arrest that was already in front of the jury based on the expert's testimony. When the prosecutor indicated he planned to call the arresting officer to establish the circumstances surrounding that incident, Albarran's counsel objected. The prosecutor explained that because Albarran had not been convicted of the weapons possession charge, the prosecution had to prove the commission of the crime through the officer's testimony for it to be used as a predicate act. The court acknowledged that might be correct, and stated that it would consider the issue of the arresting officer's testimony over the weekend.

After the court determined that any portion of the interview after the word "never" should be kept out as too prejudicial under Evidence Code section 352, Albarran's counsel determined that it would make his client look like he lied when he told the officer there is "never" a gun in his car. Albarran's counsel then argued that the only portion that should be redacted from Albarran's interview was "I've been cut up like my -- like my -- like my second violation, I think my first violation on parole when I was in CYA," but that "I been cut up with guns before" should remain. (6 RT 1381, 1388-1389; 3 CT 580.)

24

After the weekend recess, the court again raised the issue of the arresting officer's anticipated testimony. Contrary to its previous ruling on the prosecution's motion in limine, the court expressed great concern that the arresting officer's testimony would be more prejudicial than probative:

> "I need to address another issue, and that is the issue that [Albarran's counsel] brought up about the highway patrol officer who is scheduled to take the stand and discuss stopping the defendant, finding the gun in his car. [¶] I am not going to allow that in. I thought about that all weekend. Did some research on the [Evidence Code section] 352 basis. That is far more prejudicial than probative. [¶] As far as it has already been used a predicate, I understand that. But there were several predicates and more than we need. "

The prosecutor attempted to persuade the court that he should be permitted to offer the arresting officer's testimony to establish Albarran's state of mind under Evidence Code section 1101, subdivision (b). He further argued the evidence was "highly probative" and not prejudicial. As such, he asserted Evidence Code section 352 did not prohibit the admission of the evidence.

In response, the court observed:

> "I understand your argument. And to be perfectly frank, initially, that was my thought process. [¶] But having gone over the evidence in this trial and having gone over some research and things like that, I'm changing my ruling. I'm sorry. But I think it's the fair thing to do. [¶] It has come in. The jury has been instructed to consider it only for the purpose that Deputy Ortega used it to determine this was a gang. Now you're asking it come in for another reason. You're asking that it come in to show the defendant had knowledge and that the defendant had other things. That's not the purpose of a predicate act. This was only ever admitted to be a predicate act to show that the gang was a criminal street gang. [¶] You don't need -- I think we had -- what did we have -- four or five of those in. We don't need that many. Plus you have this one. So at this point, to let it in, it's

25

being let in, as you just argued, to show his state of mind, to show his knowledge that other people have guns and things like that. That's not the job of the predicate act. And that was the only reason it was allowed in was for the predicate act purpose. [¶] There are more than sufficient numbers of predicate acts already that you have that serve the purpose of a predicate act. And for you to want this to come in now, as you just discussed, you want it to come in now for other reasons. And on a 352 analysis, letting it in for those other reasons is far too prejudicial to let it in. And that's my ruling."

## B. Law and Analysis

It is clear from the record that the trial court limited evidence of Albarran's prior crimes as evidence of the VOR gang's predicate offenses. Accordingly, we evaluate Albarran's objections to the admission of this evidence within the predicate acts gang evidence context.

The California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.) criminalizes active participation in a criminal street gang and the commission of other crimes for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subds. (a) & (b).) "A criminal street gang is any ongoing association that has as one of its primary activities the commission of certain criminal offenses and engages through its members in a 'pattern of criminal gang activity.' [Citations.] A pattern of criminal gang activity is 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' specified criminal offenses within a certain time frame, 'on separate occasions, or by two or more persons' (the 'predicate offenses')." (*People v. Tran* (2011)

26

51 Cal.4th 1040, 1044 (*Tran*).) Section 186.22, subdivision (e), lists 33 specific offenses that qualify as predicate offenses.

It was alleged all of the crimes charged against Albarran were committed for the benefit a criminal street gang under section 186.22, subdivision (b) [street gang enhancement]. Therefore, evidence of Albarran's gang affiliation and activity was directly relevant to the gang related charges and enhancements. (*People v. Williams* (1997) 16 Cal.4th 153, 193.) The prosecutor was required to establish that (1) one of the gang's primary activities was commission of one or more of the 33 crimes listed in section 186.22, subdivision (e) (often referred to as predicate offenses), and (2) there was the requisite "pattern" of criminal conduct because two or more predicate offenses were committed on separate occasions by two or more persons. These requirements are often satisfied by the testimony of a police gang expert who can express an opinion on the primary activities of the gang in question. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.)

In *Tran*, *supra*, 51 Cal.4th 1040, the Supreme Court ruled that evidence of a defendant's own prior criminal conduct may be admitted to prove a predicate offense under the gang enhancement statutes (§ 186.20 et seq.), subject to an appropriate balancing of the probative value of the evidence versus its prejudicial effect under Evidence Code section 352. (*Tran*, *supra*, at pp. 1046-1050.) The Court rejected the argument that use of a defendant's prior offense to show a predicate offense is necessarily prohibited in all cases by Evidence Code section 352. (*Tran*, *supra*, at p. 1046.) The

27

Supreme Court reasoned, "That evidence of a defendant's separate offense may be admissible to prove a predicate offense does not mean trial courts must in all cases admit such evidence when offered by the prosecution. Considerations such as those described in *People v. Ewoldt* [(1994)] 7 Cal.4th [380] at pages 404-405 [(*Ewoldt*)], will still inform the trial court's discretion and in an individual case may require exclusion of the evidence." (*Tran*, *supra*, at p. 1049.)

As our high court notes, a trial court must engage in an Evidence Code section 352 analysis to determine whether to admit evidence of a defendant's prior offense as a predicate offense. (*Tran*, *supra*, 51 Cal.4th at p. 1048.) Here, we are faced with a unique situation. The trial court considered Evidence Code section 352 in ruling on the prosecution's motion in limine to allow evidence of Albarran's prior firearms possession offense to be offered as a predicate act and as evidence of identity, motive, knowledge, or intent of Albarran. Ultimately, the trial court allowed the prosecution's gang expert to testify about Albarran's previous firearm possession offense.

However, when the prosecution wanted to offer evidence of the arresting officer, the court reconsidered its previous ruling, reflected on the evidence at trial and conducted additional research regarding Evidence Code section 352, leading the court to change its ruling. It found the arresting officer's proposed testimony about Albarran's previous offenses to be "far more prejudicial than probative" and "far too prejudicial to let it in." We cannot reconcile the court's ruling on this evidence in response to the prosecution's motion in limine with its ruling on the testimony of the arresting officer. We fail to see

28

any justification in the record before us that would allow the court to admit evidence of Albarran's prior offense as a predicate act, but later determine that the same evidence is too prejudicial to be admitted under Evidence Code section 352. This is precisely the analysis required by *Tran*, *supra*, 51 Cal.4th 1040 and *Ewoldt*, *supra*, 7 Cal.4th 380. It is clear that the trial court engaged in this analysis in the first instance, found no prejudice, later realized its finding was incorrect, and changed its ruling.

On the record before us, we agree with the trial court that evidence of Albarran's prior offenses was highly prejudicial and should not have been admitted under Evidence Code section 352. The primary defense in Albarran's case was that he was only calling Ames to make up for a lack of numbers on his side and create a fair fight. Evidence was offered that Albarran did not ask Ames to bring a gun and did not believe he would do so. Further, there was no evidence that Ames was a member of VOR. Against this backdrop, evidence that Albarran had once been arrested for possession of firearms is highly prejudicial and does not establish that Albarran knew that Ames would respond to Albarran's call by shooting at the other car.

In addition, we are not persuaded by the People's argument that any prejudicial impact of the evidence was limited by the court's limiting the admissibility of the evidence as a predicate act. As the trial court noted, there were "more than sufficient numbers of predicate acts" admitted into evidence in addition to Albarran's prior offense. We interpret these comments by the trial court as an indication that evidence of Albarran's prior offense was cumulative of evidence of other predicate acts. (See Evid.

29

Code, § 352.) As such, we disagree with the People that evidence of Albarran's prior offense was necessary to prove the required elements of gang enhancement. This is especially true here where there is no real dispute that Albarran was a member of VOR, VOR is an actual criminal street gang, and Albarran is not challenging the sufficiency of the evidence supporting the jury's findings that all the crimes were committed for the benefit of a criminal street gang.[3]

Simply put, we conclude the trial court erred by admitting evidence of Albarran's prior offense. We will discuss the prejudicial impact of this error in the cumulative error section below.

IV

*PROSECUTORIAL MISCONDUCT*

Albarran maintains the trial court erred in denying his motion for mistrial and his subsequent motion for a new trial based on claims of prosecutorial misconduct. Specifically, Albarran insists the prosecutor committed misconduct by eliciting inadmissible evidence from a witness, misrepresenting the time estimate for trial, and

---

[3] We also are concerned whether Albarran's arrest for possession of firearms was admissible without proof that it was actually committed. (See *Tran*, *supra*, 51 Cal.4th at p. 1046; *People v. Loeun* (1997) 17 Cal.4th 1, 9.) Here, the prosecutor offered no evidence that Albarran committed the crime of possession of firearms, except for the hearsay testimony of the gang expert. There was no evidence presented that Albarran was convicted of this crime. In other words, the testimony of the arresting officer was necessary to prove the actual commission of the crime at issue, but the trial court found that such testimony was too prejudicial under Evidence Code section 352. However, without it, the prosecutor could not establish the commission of the crime. For this reason as well, we question the court's determination that the prior crimes evidence, through the gang expert's testimony, was admissible.

telling the court and Albarran's counsel that he was not going to use Albarran's statements against him, which caused Albarran's counsel not to address those statements in his opening statement and changing the tactical defense to be presented.

## A. Background

Prior to trial, Albarran's counsel objected to any reference to Albarran's prior arrest or probationary status at the time of the instant offenses. The trial court agreed and ruled that Albarran's probationary status was to be excluded at trial.

At trial, during Ana Mora's testimony on direct examination as a witness for the prosecution, the following occurred:

> "[Prosecutor]: In -- prior to September 3rd, 2007, was Mr. Albarran living with you at your home?
>
> "[Mora]: At what time?
>
> "[Prosecutor]: What?
>
> "[Mora]: I didn't —
>
> "[Prosecutor]: Before September of 2007
>
> "[Mora]: Before.
>
> "[Prosecutor]: Do you recall him moving into your home? Or when was the last time he was in your home -- he lived in your home?
>
> "[Mora]: He lived with me before 4th of July, and the last one when you guys arrested -- when you guys arrested is when the last time he was living with me.
>
> "[Prosecutor]: So you remember the day that the sheriff's deputies came to your home and arrested Mr. Albarran?
>
> "[Mora]: Yes.

31

"[Prosecutor]:  That only happened once, correct?

"[Mora]:  Yes.

"[Prosecutor]:  And prior -- and since then, Mr. Albarran, of course, has not lived with you?

"[Mora]:  No.

"[Prosecutor]:  Prior -- at that time, was he staying at your house, at least?

"[Mora]:  Yes.

"[Prosecutor]:  Was Mr. Albarran staying at your house at the time the sheriff's came?

"[Mora]:  Yes.

"[Prosecutor]:  Prior to that, had he been living with you at the house?

"[Mora]:  Yes.

"[Prosecutor]:  When was that?

"[Mora]:  He moved with me when he get out of -- from jail, from juvenile, and he stay with me.

"[Prosecutor]:  And when did he get out?

"[Mr. Rojo]:  Your Honor, I object to the statement.

"[The Court]:  Sustained.  I'm going to have that statement stricken, and ask you to please refer to dates as opposed to things.  [¶] And ask the jury not to pay -- give any attention to what was just said. And I'm going to ask [the prosecutor] to -- I'm going to strike the question and the answer, and ask [the prosecutor] to re-ask the question."

32

Albarran's counsel moved for a mistrial because the prosecution had not admonished Mora to refrain from referencing Albarran's time in custody despite the court's previous ruling excluding such evidence. Albarran's counsel further requested to voir dire Mora to determine whether she had been told to reference juvenile hall. The prosecutor responded that he did not attempt to elicit the information, but that he was simply trying to get her to identify the time based on holidays or times of the year, and she volunteered the fact that Albarran had been in custody. He further said, "it was not something that I asked her to do or intended for her to do" and noted that she was nervous and does not focus well on relating the time frame, so it was likely an event that she was familiar with and used that as a reference point.

In response to Albarran's counsel's argument that Mora's testimony was unnecessary because he agreed to waive a hearsay objection to information appearing on Mora's cell phone bill, the prosecutor explained that the purpose of her testimony went beyond merely identifying a telephone number on her cell phone bill. According to the prosecutor, because Mora's testimony involved more than simply the phone bill, "the time frame was something that was just so peripheral, you know, it didn't even occur to me to discuss it with her because I was just establishing the time frame as sometime before September 3rd, 2007."

Albarran's counsel questioned Mora regarding what she was told by the prosecutor. She testified that she was interviewed by the prosecutor once during Ames's trial and once just before her testimony at issue here, and that she said Albarran moved in

33

with her after he got out of "jail or juvy" both times. She also testified that she had neither been told to say anything about juvenile hall or jail nor to refrain from mentioning it either time she met with the prosecutor.

Albarran's counsel argued that the prosecutor purposely elicited the answer from Mora, which was misconduct, and the basis for a mistrial. The prosecutor responded that he only asked her a general question and that she volunteered the juvenile hall/jail information. When the court asked the prosecutor if Mora had told him the information twice that day and once during Ames's trial, the prosecutor said his recollection was that she told him once that day before her testimony and once prior to Ames's trial, but that she did not testify that way on the stand in Ames's trial. The court took the matter under submission.

After reviewing the transcript of Mora's testimony in Ames's trial,[4] the court determined that the prosecutor's recollection that Mora had not referenced juvenile hall or jail in Ames's trial was incorrect. Further, the court found that the prosecutor improperly elicited Mora to testify about Albarran getting out of juvenile hall prior to moving in with her at Ames's trial as well as Albarran's trial:

> "So to indicate to this court now that she testified the same way and that you had no idea that's what she was going to say, not only did you have an idea, because she testified about juvenile, juvy and juvenile hall. You elicited it when she said that. You elicited it now. . . . You wanted it clear. And it was clear, so it's very disingenuous for you to sit here now and say she never said anything, you had no idea what to expect when you repeatedly

---

[4]     Ames's trial occurred prior to Albarran's trial.

34

followed up on that.  [¶] And it appears to me that you deliberately disobeyed this court's orders.

Ultimately, however, the court found that the misconduct did not require a mistrial because (1) more damaging evidence that Albarran was a self-admitted gang member had come out in trial, and (2) the only comment was that Albarran was in jail and, as far as the jury knew, he could have been in jail for something as simple as a parking ticket. Also, the court noted that it had admonished the jury to disregard the comment.

Albarran's counsel renewed his motion for mistrial twice more.  Each time, the court reiterated its previous findings and ruling.

At the close of evidence, Albarran moved for a new trial based, in part, on the ground that the prosecutor's misconduct with respect to Mora's testimony was deliberate and willful and the jury admonition did not cure the prejudice caused by the misconduct. After reviewing the pleadings, and hearing argument by the parties, the court denied the motion essentially on the same grounds it had previously denied the mistrial motions.

In addressing the alleged misconduct with respect to Mora's testimony, the court reiterated its finding that misconduct had been committed, but that as soon as the jail comment was made, Albarran's counsel objected and the court admonished the jury. Additionally, any harm that might have been occasioned by Mora's testimony paled in comparison to the other evidence of Albarran's criminal behavior, such as his gang affiliation, and evidence of having a concealed weapon that was introduced in the trial. In addressing Albarran's claim of structural error based on other alleged purposeful acts committed by the prosecutor, the court found that a prosecutor is entitled to reassess

35

strategy as a case evolves, and there was no evidence that the prosecutor deliberately hurt the defense in any way. Further, the court did not believe that anything that occurred was sufficient to undermine the credibility of the trial process.

The court stated:

> "The standard for granting a new trial is: Was there substantial likelihood that the outcome of the trial would have been different had the jury not heard that the defendant had been in jail? And I -- for all the reasons I've said repeatedly -- I do not believe it would have been. Evidence was brought in that Mr. Albarran was a self-admitted gang member. Improper conduct that came in was that he had just gotten out of jail not what he had been in jail for, whether it was a conviction, a restraining order, anything else; whether it had to do with the prior crimes that the jury knew he committed.
>
> "Nonetheless, the jury was immediately admonished to disregard the comment, and I have no reason to believe they didn't follow that admonishment. Whether the comment was intentionally elicited or not, I do not believe it had any significance on the case, nor is there a substantial likelihood that the outcome would have been different had the jury not heard the statement.
>
> "While I did find that there was prosecutorial misconduct, it was not prejudicial misconduct that created the likelihood that the outcome would have been different; therefore, the appropriate sanction is not a mistrial."

In addition to the grounds raised by Albarran in his multiple motions for a mistrial and his motion for a new trial at the close of evidence, Albarran points out the prosecutor's unprofessional conduct throughout the trial. For example, the court admonished the prosecutor for laughing at a question that Albarran's counsel was asking a witness. The prosecutor apologized, claiming his laughing was not intentional. The court was not convinced and reminded the prosecutor: "[D]o you know how many times

you've said that to the court just in one day?  You know, we go to sidebar, I tell you not to talk about something, you come back out and you talk about it, and then I have to say something again and you apologize."  The court further clarified:

> "On the record, when I said something to the jury about not paying attention to [the prosecutor's] laughter, I was sure that it had nothing to do with the matter at hand.  I said that for the sake of the jury.  That was not the case.  Everybody in here knew what was happening, and it was directly related to [Albarran's counsel's] question about family values.  I want the record to reflect that."

The court also admonished the prosecutor for sighing during Albarran's questioning of witnesses and following a ruling he did not agree with.  In response, the prosecutor claimed that he did not intend his sighing to be a communication.  The court noted that the prosecutor had sighed three times that day and the court had instructed him to act professionally at side bar at least twice.  The court further determined that the sighing was intentional and it warned the prosecutor that any further like conduct would not be tolerated.

### B.  Law and Analysis

We review a trial court's denial of a motion for mistrial or motion for a new trial under an abuse of discretion standard.  (See *People v. Ault* (2004) 33 Cal.4th 1250, 1260; *People v. Ayala* (2000) 23 Cal.4th 225, 283.)  Here, Albarran's motions for a mistrial and new trial motion rely on his claim of prosecutorial misconduct.

A prosecutor in a criminal case can commit misconduct under either federal or state law.  "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a

37

denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"When a prosecutor intentionally asks questions, the answers of which he knows are inadmissible, the prosecutor is guilty of bad faith attempts to improperly persuade the court or jury." (*People v. Parsons* (1984) 156 Cal.App.3d 1165, 1170; see *People v. Crew* (2003) 31 Cal.4th 822, 839.) A prosecutor is also " 'under a duty to guard against inadmissible statements from his witnesses and guilty of misconduct when he violates that duty.' " (*Parsons*, *supra*, at p. 1170.) It is clear from the record that the prosecutor intentionally asked questions of Mora that he knew would elicit answers that would include inadmissible evidence. The trial court was very thorough in its consideration of this issue and, as we discuss above, set forth details supporting its conclusion that the prosecutor "deliberately disobeyed" the court's orders by questioning Mora about the time frame Albarran moved in with her. The People offer no argument why the trial court's conclusion was incorrect.

In addition, we are troubled by the prosecutor's other unprofessional conduct and demeanor throughout trial. Apparently, he laughed during Albarran's counsel's examination of a witness. In addition, he sighed multiple times in the presence of the jury, in response to questions of the witness and the trial court's rulings. Although we appreciate the difficulty facing a prosecutor and the desire to obtain a conviction, we

expect all prosecutors to comport to basic professionalism in the courtroom. "It is a prosecutor's duty 'to see to it that those accused of crime are afforded a fair trial.' [Citation.] 'The role of the prosecution far transcends the objective of high scores of conviction; its function is rather to serve as a public instrument of inquiry and, pursuant to the tenets of the decisions, to expose the facts.' " (*People v. Andrews* (1970) 14 Cal.App.3d 40, 48.)

"Prosecutors, however, are held to an elevated standard of conduct. 'It is the duty of every member of the bar to "maintain the respect due to the courts" and to "abstain from all offensive personality." [Citation.] A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation.] As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." [Citation.] Prosecutors who engage in rude or intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve.' " (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.)

Here, the prosecutor's conduct at trial fell well below the standard expected of a prosecutor. This conduct coupled with the prosecutor intentionally eliciting inadmissible evidence clearly amounts to misconduct. The People, however, argue the misconduct did

39

not prejudice Albarran. Although we view the issue of prejudice as a close call under the circumstances in the record before us, we evaluate any prejudice arising out of prosecutor misconduct along with the other errors we conclude exist in the cumulative error section below.

V

*CUMULATIVE ERROR*

Albarran contends that even if no individual errors were prejudicial alone, the cumulative effect of multiple errors require reversal. When a defendant claims cumulative error the "test is whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.) "[W]e review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid*.) The cumulative effect of the errors discussed above (instructing the jury under former CALCRIM No. 400 and the admission of other crimes evidence) as well as the intentional prosecutorial misconduct require reversal.

This is one of those rare cases where too much went wrong, undermining our confidence that Albarran received a fair trial. It is undisputed that Albarran's guilt for any of the charged offenses hinged on his aiding and abetting Ames's shooting at the Honda. Although Albarran called Ames to help deal with the men in the Honda, there is no evidence that Albarran fired any shots at the men on the night in question. The prosecution needed to prove beyond a reasonable doubt that Albarran had the requisite

40

mens rea to be found guilty of murder and attempted murder. As such, it was critical to establish Albarran's intent in calling Ames and what Albarran believed Ames would do once he arrived.

Moreover, the jury appeared to have focused on this issue in asking the following question during deliberations: "Under the law, are the aider and abettor's actions/intentions and the shooter's actions/intentions considered the same?" Based on this question, the jury seemed to be concerned about the difference between Ames's actions and intentions as the shooter and Albarran's actions and intentions in calling Ames for help. In response to this question, the trial court reread a few of the jury instructions, including CALCRIM No. 400, which contained the "equally guilty" language. As we discuss above, we conclude that this case is analogous to *Nero*, *supra*, 181 Cal.App.4th 504 and the "equally guilty" language was confusing to the jury. Albarran's mens rea was highly contested as an aider and abettor and the inclusion of the phrase "equally guilty" in CALCRIM No. 400 only muddled the issue. Although this error by itself might not cause us to question the fairness of Albarran's trial, its prejudicial effects are exacerbated by the other errors.

For example, further garbling the mens rea issue, the trial court allowed the gang expert to testify that Albarran had been arrested for possessing one loaded and one unloaded firearm in his car during a traffic stop. When the court ruled on the prosecution's motion in limine to allow this evidence, the court found that the evidence

was admissible to establish the predicate crimes of the VOR gang and also that it was relevant as to identity, motive, knowledge, and intent.

However, when the prosecutor later in the trial attempted to offer the testimony of the arresting officer, the trial court changed its mind, finding the evidence to be "far more prejudicial than probative" and "far too prejudicial to let it in." Moreover, the court indicated that the prior firearm possession charge was cumulative and unnecessary even as a predicate crime of the VOR.

Here, like the "equally guilty" language of CALCRIM No. 400, the admission of the prior crimes evidence could have greatly influenced the jury's evaluation of Albarran's mens rea. The fact that Albarran was arrested for possession of two firearms, one of them loaded, could have led the jury to believe that he often carried guns and would have called someone (Ames) who often had a gun as well and would arrive on the night in question to shoot at the men in the Honda.

Also, we are not persuaded that the court's instruction to the jury that it may only consider Albarran's firearm possession charge for purposes of establishing that VOR was a gang rendered the error not prejudicial. This is especially true in the context of the intentional prosecutorial misconduct that occurred during trial.

It cannot be disputed that the trial court found the prosecutor here intentionally elicited testimony from Mora that Albarran moved in with her after being released from juvenile hall. Albarran's counsel objected to this question and testimony and the trial court admonished the jury to disregard the answer. Nevertheless, when discussing its

42

ruling on Albarran's motion for a new trial, the court noted that "[t]he lay public . . . thinks that having possession of a concealed weapon is a real bad crime." Further, the court indicated its belief that the jury would not know that "in many cases you get convicted of crimes and don't go to jail." Thus, the court reasoned that the jury merely hearing that Albarran had been in jail, but not knowing why supported its conclusion that there was no reasonable possibility of a different outcome had the evidence not been admitted. Although the trial court was only analyzing the impact of the prosecutorial misconduct based on the prosecutor eliciting inadmissible testimony, its comments underscore the great potential for prejudice when the prosecutorial misconduct is considered in connection with the prior crimes evidence.

Here, the jury knew Albarran was a gang member. They knew he called Ames for help. As an aider and abettor, the prosecutor had to prove Albarran had the requisite mens rea to convict him of murder and attempted murder. The trial court allowed the prosecutor to offer highly prejudicial evidence that Albarran was previously arrested for possession of two firearms. Ames fired a gun at the Honda multiple times, killing the victim and attempting to kill the other passengers in the car. The prosecutor intentionally violated a court order by eliciting evidence that Albarran had been in jail previously. As the court noted, the jury would believe that being in possession of a firearm or being a gang member are "real[ly] bad crimes." The jury questioned whether Albarran's actions and intentions should be considered the same as Ames's. In response, the trial court reiterated the confusing "equally guilty" language in CALCRIM No. 400, at least

potentially misleading the jury that Albarran shared Ames's mens rea under the aiding and abetting law.  On this shaky foundation, we add the prosecutor's tactless conduct during trial.  Considering the errors discussed above as well as other irregularities in the record, we cannot be confident that it is reasonably probable the jury would not have reached a result more favorable to Albarran in their absence.  (See *People v. Kronemyer*, *supra*, 189 Cal.App.3d at p. 349.)

DISPOSITION

The judgment is reversed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

44